PORTLAND TERMINAL CO. AND MAINE CENTRAL RAILROAD CO.

*vs.*

BOSTON AND MAINE RAILROAD.

Cumberland.      Opinion January 4, 1929.

*Charles H. Blatchford,* for complainants.
*Cook, Hutchinson, Pierce & Connell,* for respondent.

Sitting: Wilson, C. J., Philbrook, Dunn, Deasy, Sturgis, Pattangall, JJ.

Sturgis, J.   The Portland Terminal Company, originally incorporated under Private and Special Laws of 1887, Chap. 96, as the Portland Union Railway Station Company, by Private and Special Laws of 1911, Chap. 189, acquired its present corporate name, and by extension of its original charter was authorized to include within its limits and acquire by contract, purchase or lease, any or all of the properties situated in the cities of Portland, South Portland and Westbrook, in the State of Maine, owned by the Bos-

ton and Maine Railroad, the Maine Central Railroad Company, or any other railroad using the terminal. Issuing capital stock and bonds as authorized by the Act, the Terminal Company purchased the properties of the Maine Central Railroad Company and the Boston and Maine Railroad situated within the cities designated, and on July 1, 1911, began operation under its extended charter, with these two railroads as sole users of its facilities.

Section 7 of the Act of 1911 provided that "The railroad companies using the railway terminal shall pay to the terminal company for such use, in monthly payments, such amounts as may be necessary to pay the expenses of its corporate administration and of the maintenance and operation of the terminal and of the facilities connected therewith and owned by said terminal company, including insurance and all repairs, all taxes and assessments which may be required to be paid by said terminal company, the interest upon its bonds or other obligations issued under the provisions of this act as the same shall become payable, and a dividend, not to exceed five per cent per annum, upon its capital stock. Each of such railroad companies shall pay for such use of the terminal and its facilities in the proportion in which it has the use thereof, the same to be fixed by the written agreement of all such railroad companies, and in case they fail to agree, the board of railroad commissioners shall determine such proportions upon the application of said terminal company or of any of said railroad companies. Said proportions as so fixed, either by agreement or by decision of the board of railroad commissioners, may be revised and altered from time to time, either by the written agreement of all the railroad companies at any time, or by the board of railroad commissioners upon like application, at intervals of not less than three years. The decisions of the board of railroad commissioners fixing said proportions of payments shall be final and binding upon all of said railroad companies, and the payments required to be made by them respectively to said terminal company either by such agreement or decisions shall be deemed part of their operating expenses, and the supreme judicial court or any justice thereof shall have jurisdiction in equity to compel such payments to be made, either by mandatory injunction or by other suitable process."

In this bill in equity, dated January 15, 1926, the Maine Central Railroad Company joins with the Terminal Company as plaintiff,

alleging that pursuant to the provision of Section 7, as above quoted, the railroads entered into an agreement fixing the proportions which each should pay for its use of the terminal facilities, which is still in force and effect, that the Boston and Maine Railroad has not paid its proportionate part of the expense of the terminal as so determined and is indebted to the Terminal Company for this deficiency in payments. The bill concludes with a special prayer for mandatory process to compel payment and a prayer for general relief.

The answer denies the existence of an agreement in accordance with the Act, with an affirmative defense that the proportions of payments due from the two railroads to the Terminal Company have been determined by decrees of the Public Utilities Commission of Maine (as successor of the former Board of Railroad Commissioners) subsequent to and inconsistent with the agreement relied upon by the plaintiffs in their bill.

In so far only as the allegations of the bill and the evidence entitle the plaintiffs to equitable relief can a decree therefor be rendered, *Singhi* v. *Dean*, 119 Me., 287, 291; *Glover* v. *Jones*, 95 Me., 303, 307, and this within the jurisdiction conferred upon this Court by Section 7 of the Act. The plaintiffs declare upon an "agreement" alleged to be within the provisions of the Act. Hence upon this bill this Court has jurisdiction only to compel payment by the defendant Railroad as due under and by virtue of such an agreement.

Turning back to the early history of the Terminal Company, we find that prior to the beginning of operations under the new charter the Terminal Company, under the name of the Portland Union Railway Station Company, operated the terminal facilities at Portland, Maine, used by the Boston and Maine Railroad and the Maine Central Railroad Company. Originally it was operated only as a passenger terminal. On May 1, 1910, however, a Terminal Division was established, bringing both passenger and freight terminals within its operations. An arrangement was then made between the roads for the determination of the proportionate division of the cost of the operation of the terminal division chargeable to each. For the first six months period the percentage of cost thus determined was 50.9 for the Maine Central and 49.1 for

the Boston and Maine, and for the second six months 52 for the Maine Central and 48 for the Boston and Maine. Settlements between the roads for these periods were made on these percentages.

July 1, 1911, the Act of 1911 became effective. Under it the Terminal Company extended the limits of the terminal and included within its holdings properties of both roads previously operated outside the terminal division. In passing it may be noted that the capital stock of the Terminal Company, under its original charter, was owned in equal shares by the Boston and Maine Railroad and the Maine Central Railroad Company, and this equality of ownership of stock continued when the Terminal Company began its extended operations. The details of this stock ownership and its subsequent history, however, are not important in the determination of this case. The Railway Station Company and its facilities was the terminal for the two roads here involved and used by them only. Its affairs were managed and controlled from their offices, and its official personnel included members of their executive boards. Charles S. Mellen was President of the Boston and Maine Railroad, President of the Maine Central Railroad Company, and President of the Portland Terminal Company, and to use his expression in reference to the roads and the terminal, they were "all in one family." The Vice President and General Manager of the Boston and Maine was Mr. Frank Barr. Mr. Morris McDonald of Portland occupied a similar position with the Maine Central.

Just previous to July 1, 1911, the effective date of the operation of the terminal by the Terminal Company, Mr. Mellen, the President of the three corporations, discussed terminal operations with Mr. McDonald, who tells us that this meeting was on the morning of June 19, 1911, at Portland, and says "Mr. Mellen represented the Portland Terminal Company, and he also represented the Maine Central Railroad Company and the Boston and Maine." For the Maine Central Railroad Mr. McDonald "was discussing the Maine Central interests, and called his attention to the percentages that we had used during the Terminal Company's operations, and other matters in connection with it, until I built up a picture that seemed to me to be pretty satisfactory in the matter which I was going to recommend, which was for simplification and other reasons, that I had thought we had better make the percentages 50 to each company; and as I remember it, he thought it over

and he said 'That is very fair, and you are very close to it now; there are a lot of benefits the two roads get, and we are all in one family and it seems to me that is perfectly fair and proper, and that will be agreed to as far as I am concerned on the Boston and Maine.' . . . I think he said 'You write to Frank Barr, and I will do whatever is necessary at Boston to have the matter understood.' "

Following this conversation Mr. McDonald says he wrote on the same day the following letter:

"Mr. Frank Barr,

Vice President & General Manager,

Boston and Maine Railroad, Boston, Mass.

Dear Sir:—

As you know, the operation of the Terminal Division which expires midnight of June 30th, has been operated on a percentage basis, arrived at according to the traffic conditions, and it is intended that the operations by the Portland Terminal Company thereafter to put the Boston and Maine and Maine Central operations on a fifty per cent basis to each line.

This for your information.

Yours truly,

(signed) Morris McDonald

Vice-President and General Manager."

Mr. McDonald continues: "I heard nothing further from it, but I remember shortly after that I had a talk with Frank Barr on the telephone, and he said he had got my letter, as I remember it, and that he hadn't had a chance to talk with Mr. Mellen, but as far as he was concerned it was all right."

Apparently this discussion of the apportionment of terminal expense by Mr. Mellen and Mr. McDonald, with the letter to Mr. Barr and his conversation with Mr. McDonald over the telephone, concluded the discussion of this matter by the responsible officers of the three railroad corporations. The arrangement thus made was carried into effect as of July 1, 1911, and continued in force until the roads passed under Federal control in the World War period. It was acquiesced in by the several corporations, and accounts were kept and payments made in accordance with it.

In January, 1918, however, the Boston and Maine Railroad instituted a protest against the continuance of this apportionment,

and its President (who was then also temporary receiver under pending court proceedings) wrote a series of letters to Mr. McDonald, who had succeeded Mr. Mellen as President of the Maine Central Railroad and of the Portland Terminal Company, asking for a new apportionment of terminal expense. This request being denied, on February 18, 1918, a petition to the Public Utilities Commission of Maine was filed by the Boston and Maine Railroad, asking that Board to fix the proportions of terminal expense which the two railroads should pay. In this connection it is sufficient to note that this petition was dismissed without prejudice because of continuance of Federal control.

Prior to March 1, 1920, when the roads were returned to private ownership, viz., on January 19, 1920, addressing Mr. McDonald as President of the Maine Central Railroad Company, Mr. Hustis, the then President of the Boston and Maine Railroad, wrote Mr. McDonald seeking a readjustment of the existing apportionment of terminal charges, with the suggestion that if it were not possible to adjust the matter by negotiation it would be necessary to make application again to the Public Utilities Commission. Mr. McDonald's reply, dated January 28, 1920, stated his disbelief in the propriety of handling the matter by negotiation, with a suggestion to go to the Commission first and get the matter reviewed and decided.

As a result, on March 4, 1920, the Boston and Maine Railroad again filed a petition with the Public Utilities Commission of Maine for determination of percentages to be paid by it and the Maine Central Railroad for use of the Terminal Company's facilities, and on September 1, 1920, a preliminary decree was rendered, directing the Terminal Company to collect, record and report statistics relative to the use of its facilities, with provision that the tenant railroads should contribute as heretofore to the operating expenses of the Terminal Company, final adjudication upon the petition when made to be retroactive to September 1, 1920, with adjustment of payments so made in accord with proportions as finally determined.

This decree was carried into effect, data collected, records kept, and report filed with the Public Utilities Commission, resulting in a decree on the 31st day of January, 1924, determining the per-

centages to be paid by the tenant railroads as 55.1888 for the Maine Central Railroad and 44.8112 for the Boston and Maine Railroad. This decree, however, was later modified by stipulation of the parties and decree of the Commission of July 15, 1924, percentages being finally fixed as 54.89 for the Maine Central Railroad and 45.11 for the Boston and Maine Railroad.

This general review of the making of the agreement by which the expense of the Terminal Company was apportioned between the Boston and Maine Railroad and the Maine Central Railroad Company and the subsequent acts and attitude of the two roads concerning it, is sufficient to outline the basis upon which the plaintiffs here claim the making of a "written agreement" required by Section 7 of the Act of 1911. Their contention is that the facts thus stated constitute a "written agreement" within the meaning of the statute, and they support its continued existence by a denial of the jurisdiction of the Public Utilities Commission of Maine in the several proceedings brought before them, with a resulting nullity in their decrees. They assert that the terms and conditions of the letter of June 19, 1911, of Mr. McDonald, then Vice President and General Manager of the Maine Central Railroad, to Mr. Barr, then Vice President and General Manager of the Boston and Maine Railroad, having been accepted and acted upon for many years by the two railroads, the letter and its acceptance constitute a "written agreement" which determines the proportionate payments to be made by the tenant railroads, and authorizes compulsory payment of deficiencies amounting to more than $600,000. They rely in support of this claim on the law of contracts, and invoke the well recognized principle that when one of the parties to a contract signs a writing and the other orally accepts it both are bound. Bishop on Contracts, Enlarged Ed., Sec. 342; and Williston on Contracts, Vol. I, Sec. 90a.

We are not convinced that this contention can be sustained. The question here is not one of the law of contracts but of statutory construction, and the proper meaning to be ascribed to the words "written agreement" in the light of context and subject matter involved. The question is not whether the Boston and Maine Railroad is "bound" to the Maine Central Railroad Company or the Portland Terminal Company and liable in a suit at law

upon its contract, but whether proportionate charges by the Terminal Company have been fixed by an agreement within the terms of the statute which still exists and can be enforced in this proceeding.

It is a fundamental rule in the construction of statutes, that unless inconsistent with the plain meaning of the enactment, words and phrases shall be construed according to the common meaning of the language, and technical words and phrases and such as have a peculiar meaning convey such technical and peculiar meaning. R. S., Chap. 1, Sec. 6. In and of this major rule is the rule that legal terms are presumed to be used according to their legal significance. *McLellan* v. *Lunt*, 14 Me., 258.

"Agreement" is defined by Webster as "a concurrence in an engagement that something shall be done or omitted; an exchange of promises; mutual understanding, arrangement or stipulation." It is "the language embodying reciprocal promises."

Mr. Williston, in his work on the law of contracts, Vol. I, p. 2, Sec. 2, says: "An agreement is an expression by two or more persons of assent in regard to some present or future performance by one or more of them. Agreement is in some respects a wider term than contract. It covers executed sales, gifts, and other transfers of property. It also covers promises to which the law attaches no legal obligation."

In *Sage* v. *Wilcox*, 6 Conn., 81, 85, it is said: "The word 'agreement,' in its popular and usual signification, means no more than concord; the union of two or more minds; or a concurrence of views and intention. . . . This concord or union of minds, may be lawful or unlawful; with consideration, or without; creating an obligation, or no obligation. Still, by the universal understanding of mankind, proved by daily and hourly conversation, it is an *agreement*."

And continuing the writer of this opinion says: "If the enquiry be made, whether there exists an agreement, which the law will enforce, the subject matter limits the signification of the term 'agreement,' and gives it a new and peculiar meaning. The question does not regard the broad and comprehensive intendment of the term; nor its usual and popular acceptation; but the object of the enquiry is, an agreement of a special nature, distinguished by a legal

consideration, and enforcible in a court of justice. . . . The mind, influenced by the popular and most familiar use of the term 'agreement,' considers the law as pointing to promises only; but if, from any source it appear, that the consideration was meant to be embraced, the peculiar and technical sense of a legal and sufficient contract, is seen to have been intended. . . . The word 'agreement,' if there be nothing to limit its meaning, regards promises only, and not their consideration."

"Agreement" has received multiple definition and construction in the courts of this Country and England, illustrating both the broad and comprehensive scope of the term in its usual and general use and its limited significance in the light of context and subject matter to which it has reference. It does not seem necessary here to make the exhaustive review necessary to point out the distinctions and reasons controlling the many and varied constructions placed on the word. Cases covering this field are collected and digested in 2 C. J., 979 *et seq.*, also under appropriate titles in Words and Phrases, 1st and 2d Editions.

Turning to the statutory provision before us, we are confirmed in the view that the word "agreement" as there used has a broader meaning than the word "contract," and its creation and existence cannot be measured by that branch of the law.

The Act is an re-enactment and extension of an existing corporate charter, conferring new powers and new rights upon the Corporation. It authorizes the continuance of a railroad terminal already created, with authority for extension of its property holdings and terminal facilities and service. It provides for occupation and use by the tenant railroads, and determines the amount of rentals which the Terminal shall receive, emunerating in detail the items of expense which shall in the aggregate measure the rentals charged. The right of contract as to rentals is not left to the Terminal and its users. Each of the railroads, by the Act, "shall pay for such use of the terminal and its facilities in the proportion in which it has the use thereof." The single matter left to the volition and judgment of the parties is the fixing of their proportionate liability for terminal charges. If the railroad can agree, these proportionate charges are to "be fixed by the written agreement" of all such railroad companies. If they cannot

agree, the proportions are to be determined by the Board of Railroad Commissioners.

This provision for fixing of proportionate payments does not, we think, sound in contract. It creates no legal liability on the part of one railroad to the other, or by either to the Terminal Company, which can be enforced under the law of contract. It provides for a mutual "expression of assent" enforcible only under the special jurisdiction conferred upon the court of equity by the Act. The statute creates the right and gives the remedy which is appropriate and therefore exclusive. *Miller* v. *Spaulding*, 107 Me., 271; *Hammond* v. *L. A. & W. St. Ry.*, 106 Me., 213; *Abbott* v. *Goodall*, 100 Me., 235.

The agreement contemplated by the Act must be a "written" agreement. And we are convinced that to prevent uncertainty, to perpetuate evidence, and create a memorial which permits of no doubt or uncertainty, it was the legislative intent that the agreement be written as to all the railroads, be intended as an "expression of assent" and possess some degree of formality. The "written agreement" alone is the warrant of the Terminal Company for its charges and collection of its revenues. By it is measured the liabilities of the users of terminal facilities, and in review by the tribunal designated, its terms establish the basis of remedial adjustment.

The "written agreement" of the statute is not found in the letter of Mr. McDonald of June 19, 1911, especially when read in the light of attending circumstances. As already stated in this opinion, Mr. Charles S. Mellen, President of the Boston and Maine Railroad and of the Maine Central Railroad Company, the tenant users of the terminal, and also President of the Portland Terminal Company itself, on the morning of June 19, 1911, when the letter was written, was in conference with Mr. McDonald at Portland. At Mr. McDonald's instance Mr. Mellen's attention was called to the proportions that the railroads were then paying for Terminal Company service, with the suggestion that "we had better make the percentages fifty to each Company." With the statement that "we are all in one family," and that so far as Mr. Mellen was concerned the suggestion would be agreed to by the Boston and Maine, Mr. McDonald was directed to write to Mr. Barr. He did so, and his

letter has been quoted. This conference and the writing of this letter took place eleven days prior to the effective date of the new Terminal Company operations and was undoubtedly in anticipation of that change. A careful reading of the letter convinces this Court that it is in fact but a report to Mr. Barr of the result of the conference of Mr. Mellen with Mr. McDonald. The gist of the letter lies in the statement, "It is intended that the operations by the Portland Terminal Company thereafter to put the Boston and Maine and Maine Central operations on a fifty per cent basis to each line." The purpose for which it was written is indicated by the concluding sentence, "This for your information."

Keeping in mind that no reply to this letter was written, and the only direct evidence of its receipt lies in Mr. McDonald's report of Mr. Barr's conversation over the telephone, in which Mr. Barr is quoted as acknowledging the receipt of the letter but saying that he had not then had a chance to discuss the matter with Mr. Mellen, we feel justified in drawing the inference that at some time Mr. Mellen was consulted by Mr. Barr or other official of the Boston and Maine Railroad, and in reaching the conclusion that the "agreement" fixing the apportionment of terminal charges after July 1, 1911, grew out of that consultation and the earlier verbal discussion between Mr. Mellen and Mr. McDonald at Portland. We are not of opinion that Mr. McDonald's letter of June 19, 1911, converted this verbal agreement into a "written agreement" under the statute.

This case was reported apparently upon the theory that if this Court found there was no "written agreement," the validity and effect of the decree of the Public Utilities Commission of January 31, 1924, as modified by stipulation of the parties and subsequent decree of July 15, 1924, could here be determined and compliance enforced by proper process. The bill alleges only an agreement in accordance with Section 7 of the Act as the basis of the plaintiffs' prayer for relief. In this proceeding as under the general equity jurisdiction of this Court, "relief only *secundum allegata et probata*" can be granted, *Scudder* v. *Young*, 25 Me., 154, 155; *Singhi* v. *Dean*, supra; *Glover* v. *Jones*, supra. The decrees of the Public Utilities Commission are not in issue and cannot be passed upon.

The entry is,

*Bill dismissed with a
single bill of costs.*